EISENZIMMER *v.* CONTOS.

1. Appeal and Error—Supreme Court—Review of Questions of Fact.

    Ordinarily the Supreme Court does not review questions of fact after determination of the same by the trier of the facts and review by the Court of Appeals, but where the jury, as trier of facts, is not allowed by the trial court to determine the facts, the Supreme Court may elect to review the facts to determine upon favorable view their sufficiency to support plaintiff's case.

2. Intoxicating Liquors—Question for Jury—Evidence.

    Conflicting accounts of deceased motorist's intoxication during the night and early morning and of intervals when liquor was served to him prior to accident by employees of defendants in action under the dramshop act *held,* to present issues of fact to be resolved by the jury (CLS 1961, § 436.22).

3. Evidence—Vague Witness—Cross-Examination—Withholding of Clear and Positive Testimony.

    Mere fact a witness is vague under cross-examination with regard to certain facts does not warrant the trial judge withholding clear and positive testimony by the witness regarding other relevant facts.

4. Appeal and Error—Motion for Directed Verdict—Evidence.

    Evidence is considered from the point of view favorable to plaintiff when determining whether or not defendants' motion for a directed verdict should have been granted.

5. Intoxicating Liquors—Dramshop Act—Unlawful Sales.

    An unlawful sale of intoxicating liquor by defendant liquor licensee to decedent host driver, who is alleged to have caused

---

References for Points in Headnotes

[1] 5 Am Jur 2d, Appeal and Error §§ 702, 820.
[2] 30 Am Jur, Intoxicating Liquors §§ 556, 557.
[3] 53 Am Jur, Trial § 778.
[4] 5 Am Jur 2d, Appeal and Error § 886.
[5] 30 Am Jur, Intoxicating Liquors §§ 525, 537.
[6] 30 Am Jur, Intoxicating Liquors § 556.

fatal injuries to plaintiffs' decedent, must be shown in order to impose liability under the dramshop act in action for damages alleged to have resulted from death of plaintiffs' decedent in automobile accident when car left road and hit tree, and driver is alleged to have been intoxicated at time liquor was sold to him by defendants (CLS 1961, § 436-.22).

6. SAME—DIRECTED VERDICT—DRAMSHOP ACT—UNLAWFUL SALES—EVIDENCE.

Directed verdict for defendant tavern owners at conclusion of proofs in action under dramshop act for damages resulting from death of plaintiffs' decedent *held*, improper when testimony, viewed most favorably to plaintiffs, could permit jury to conclude that motorist was served drinks by defendants while he was in an intoxicated condition, and that such condition impaired his judgment and his faculties so as to be causally related to the ensuing accident (CLS 1961, § 436 .22).

Appeal from Court of Appeals, Division 2, McGregor, P. J., Burns and Quinn, JJ., affirming Genesee, Baker (John W.), J. Submitted November 8, 1967. (Calendar No. 24, Docket No. 51,644.) Decided December 4, 1967.

4 Mich App 651, reversed.

Complaint by Rochus Eisenzimmer, individually and as guardian of the estate of Joyce Ann Wills, and Hattie Eisenzimmer against John Contos, Gust Contos, and James Contos, jointly and severally, for damages under the dramshop act resulting from the death of Jo Ann Wills, mother of Joyce Ann Wills, in an automobile accident. Directed verdict and judgment for defendants. Judgment affirmed by Court of Appeals. Plaintiffs appeal. Reversed and remanded for a new trial.

*Benton, Hicks, Beltz & Behm,* for plaintiffs.

*Milliken & Magee,* for defendants.

ADAMS, J. Plaintiffs brought an action under CLS 1961, § 436.22, CL 1948, §§ 436.29, 436.44 (Stat Ann 1965 Cum Supp § 18.993, Stat Ann 1957 Rev §§ 18.1000, 18.1015), to recover damages arising out of the death of Jo Ann Wills. At the conclusion of three days of proofs, the court directed a verdict for the defendants because of failure of proof that defendants had illegally sold or served intoxicating liquor to one Sutton while he was intoxicated, or that the liquor sold or furnished by defendants caused or contributed to the death of plaintiffs' decedent.

In denying a motion for new trial, the trial judge found as follows:

"In reviewing the testimony the court found and now finds that there was evidence that deceased Sutton was served three drinks in defendants' bar before midnight on the night in question having entered the bar between 9–10 o'clock in the evening (see testimony of Agnes Hendrix).* There is no evidence that he was served or sold a drink after that. As to Jacqueline Shepard's testimony, she could not say exactly what she had heard the waitress say as to intoxication the next morning. In any event, her testimony was not as positive as plaintiffs contend.

"Witness John Brooks, who eventually did state that he thought deceased Sutton was 'snokered,' placed him, not at defendants' bar, but at the Office Lounge. He could not be certain of the date or time. He plays in dance bands and had seen deceased Sutton at many bars previously. Martha Watkins testified definitely that this incident occurred on the night previous to the night of the fatal accident. Should the court allow the jury to speculate as to witness Brooks' assertions, when he admittedly has no memory for dates and times?

---

* The name Hendrix is sometimes spelled Hendricks. The same person is involved.—REPORTER.

"Witnesses Sheppard, Varner and Hendricks did not testify that deceased Sutton was intoxicated the evening in question.

"After leaving defendants' bar there is testimony that deceased Sutton was at the Rose Bowl restaurant where he had coffee and food. He did not appear intoxicated there. Then sometime after that he had driven his car approximately 10 miles on a busy highway running through the city of Flint to the scene of the accident. The accident occurred about 3 a.m., some three hours after he was last served at defendants' bar.   *   *   *

"As to the source of any drinks shown to have been on the table in front of Sutton after 12 o'clock at defendants' bar, the jury can not be left to speculate. See *Nyland* v. *Gemo* (1940), 295 Mich 75, 78.

"There is no evidence that deceased Sutton when he was intoxicated was sold alcoholic beverages at defendants' bar.

"Under these facts where deceased Sutton was away from defendants' bar an undetermined period of time, the inference is that he could have consumed alcoholic beverages from some other source. Such inference cannot be held as evidence against the defendants, even in a view most favorable to plaintiffs.

"The hiatus in proof here occurs after 12 o'clock. In *Bryant* v. *Athans* (1960), 362 Mich 17, 18, it was after 10 o'clock. The Court there concluded the proofs of causal connection between the statutory violation and decedents mortal injuries were conjectural.

"The court concludes in this case that the statutory violation as well as the causal connection as to decedent's mortal injuries were conjectural, and therefore plaintiffs' proofs should not go to the jury, even when reviewed in the most favorable light."

The case was appealed to the Court of Appeals. The decision of that Court, reported in 4 Mich App 651, 652, reads in part as follows:

"Appellants established that Thomas Sutton entered Contos Bar between 9 and 10 p.m., April 13, 1961. He was served 3 drinks from the time he entered and 12 o'clock midnight. There is testimony that sometime between 10:30 p.m. and 1 a.m. of the following morning he left Contos Bar and went across the street to the Office Lounge, returning to Contos Bar later in the evening. John W. Brooks, a musician at the Office Lounge, testified that Sutton was loud and boisterous at the Office Lounge in contrast to his usual personality, which was quiet and reserved. Brooks would not say that Sutton was drunk, but he did state that he was 'schnockered.' Brooks also testified that Sutton was accompanied by a red-haired woman. Jo Ann Wills did not have red hair. There is no doubt that Sutton sat at Contos Bar with Jo Ann Wills until it closed. She was a barmaid at Contos Bar and had worked until 12 midnight.

"After Contos closed, Sutton and the deceased went to the Rose Bowl restaurant to have coffee, and while they were en route to her home, approximately 10 miles north of the restaurant, Sutton's car left the road on a sharp curve.

"The strongest testimony offered by the appellant was that of Jacqueline Shepard, a waitress at the Contos Bar, who testified, after her memory was refreshed from a deposition taken a year before, as follows:

" 'Q. I will ask you again: Did you recall Aggie, Mrs. Hendrix, [Mrs. Hendrix was the barmaid on duty at Contos Bar the night of the accident] say anything about the condition of Mr. Sutton the night before the accident?

" 'A. Yes. It was what she was worried about, because she considered the fact that he was drunk, and that she served him.

" 'Q. Did she say she thought that he was?
" 'A. Yes.'

"However, when cross-examined by appellees' counsel at the deposition, the witness stated she could not remember exactly what Mrs. Hendrix had said the next day.

"The only persons present in the defendants' establishment on the tragic night who testified, were Jacqueline Shepard, Juanita Varner, and Agnes Hendrix. They all testified they only knew of 3 drinks being served to Sutton, and that he was not served any drinks after 12 midnight. There is absolutely nothing in the record to establish that the defendants sold, gave, or delivered any drinks to Sutton while he was intoxicated.

"Liability in this case must be predicated upon proof of a sale to Sutton while he was in an intoxicated condition. *Nylund* v. *Gemo* (1940), 295 Mich 75; *Juckniess* v. *Supinger* (1949), 323 Mich 566.

"The trial judge found as a matter of fact:

" 'There is no evidence that deceased Sutton when he was intoxicated was sold alcoholic beverages at defendants' bar.'

"We have carefully reviewed the record and concur in the trial court's conclusion. There being no positive or circumstantial evidence of such a sale, the action must fail as a matter of law."

This case presents two questions:

1. Was there sufficient evidence to present to the jury as to whether there was illegal service of intoxicants by defendants to Thomas Sutton?

2. Was the evidence sufficient to go to the jury as to whether the intoxication of Sutton was causally connected to the accident in which Jo Ann Wills was killed?

Both of the above questions turn upon the evidence presented for plaintiffs at the trial. While ordinarily this Court does not review questions of fact after determination of the same by the trier of

the facts and review by the Court of Appeals, inasmuch as the jury, the trier of the facts in this case, was not allowed to determine the facts, we set forth in this opinion in considerable detail the testimony we believe was sufficient upon favorable view to support plaintiffs' case.

Thomas Sutton entered the Contos Cocktail Lounge, defendants' bar, between 9 and 10 o'clock on the evening of April 13, 1961. Agnes Hendrix was employed as a waitress, barmaid and manager, at the Lounge. The following questions and answers appear in her deposition which was taken and read into evidence:

"*Q.* Do you recall how many drinks you personally served to Mr. Sutton?

"*A.* Two or three.

"*Q.* Do you recall over what period of time you served these drinks?

"*A.* It was between 9 and 12."

Sometime during the evening, Sutton left the Contos Cocktail Lounge and went to another bar nearby, the Office Lounge. John Winstead Brooks, a part-time bass fiddle player at that lounge, testified:

"*Q.* What was the first thing that attracted your attention to the fact that Mr. Sutton had come into the lounge, Office?

"*A.* You want me to throw profanity in here?

"*Q.* We want the truth. If it's profanity then let go.

"*A.* 'Hello, you fat bastard.'

"*Q.* Is that what he said?

"*A.* Yes, sir. So help me God.

"*Q.* How far away were you from him?

"*A.* Well, at the time the Lounge was packed. If you have ever been in a packed bar it's awful hard to be heard above screaming females and men. And I heard it.

"*Q.* Did everybody else in the bar hear too?

"*A.* Yes. They all went like that (indicating), because—well, by here—wait a minute. Let me say something. Everybody knew Tom. He was very well liked.

"*Q.* I see.

"*A.* And it was so surprised to see him when— they call it schnockered. That's what I call it. That's slang part.

"*Q.* Was he on this night?

"*A.* He was a weaving back and forth. I mean, I didn't get close enough to smell his breath, put it like that.

"*Q.* Did he have difficulty walking?

"*A.* Yes."

Upon cross-examination, as noted by the trial judge in his opinion, it was developed that Brooks had no memory for dates and time. It was for this reason the trial judge refused to allow the jury to consider Brooks' testimony.

Upon redirect-examination, the following was elicited from Brooks:

"*Q.* Mr. Milliken said something about being certain about the date that this all happened on, when there was—

"*A.* It was the night of the accident.

"*Q.* Would you tell the jury what you did when you got off work that night, and when you first found out about the accident?

"*A.* I went downtown and had a hot dog. I don't know whether this—I went home eventually. It was no four, five hours, or anything like that. I walked in the door. My wife, she said—my wife said 'honey, Tom Sutton has been killed'. I said: 'Okay. Okay. Whose pulling my leg?' She said: 'No. He got killed out here on Dort Highway.' I said: 'Oh, my God. I told him to take it easy.' He said that he's—I don't—I don't know whether that's the exact what I said in my deposition or not.

I just talked to the guy a few hours earlier and it was just such a shock.

"*Q.* In other words, you are testifying about these things that happened just before his death?

"*A.* Right."

The mere fact that Brooks was somewhat vague under cross-examination with regard to all of the facts and circumstances of Sutton's visit to the Office Lounge did not warrant the trial judge's withholding the clear and positive testimony this witness gave with regard to Sutton's condition upon the night which the witness precisely identified as being the one when the accident occurred.

Plaintiffs developed proof from the testimony of Jacqueline Ann Shepard, who worked as a waitress in the Contos Lounge, that Sutton was drinking when he returned later in the evening to that bar. The testimony is as follows:

"*Q.* Now, when Mr. Sutton came back to the bar on the second occasion; you said it was later in the evening, did you see anything in front of him, or did you see whether he was drinking?

"*A.* I think—I think he was, yes.

"*Q.* This was after he had come back into the bar from wherever he had gone? Is that correct?

"*A.* Yes."

Sutton left defendants' bar about 2:30 a.m. and drove Jo Ann Wills to a restaurant a mile south of the bar. The accident occurred some 30 to 35 minutes after they left defendants' lounge and 9 to 10 miles north of the restaurant. The Sutton car left the road at over 100 miles per hour as it entered a curve. It traveled 658 feet from the highway to point of last impact at a tree. There was testimony the car struck a culvert and traveled approximately 200 feet in mid-air, shearing off branches from the tops of trees as high as 15 feet from the ground.

Jo Ann Wills was catapulted 67 feet through the windshield and killed instantly. Sutton was found under the burning car. His blood hemolyzed. Consequently, a blood test, although attempted, was not possible.

Jacqueline Shepard testified that after the accident she had a conversation with Agnes Hendrix, the waitress, barmaid, and manager of the Contos Cocktail Lounge, a portion of whose deposition has previously been quoted. The testimony of Mrs. Shepard is as follows:

"*Q.* (By Mr. Beltz): I will ask you again: Did you recall Aggie, Mrs. Hendricks, say anything about the condition of Mr. Sutton the night before the accident?

"*A.* Yes. It is what she was worried about, because she considered the fact that he was drunk, and that she served him.

"*Q.* Did she say that she thought that he was?

"*A.* Yes."

Plaintiff Hattie Eisenzimmer, the mother of Jo Ann Wills, testified to a conversation with Martha Watkins, a waitress at the Contos Lounge, which took place 3 or 4 days after Jo Ann Wills' funeral, when Martha Watkins brought a purse of money to Mrs. Eisenzimmer. Mrs. Eisenzimmer's testimony is as follows:

"*Q.* Now, did she [Martha Watkins] tell you anything about Thomas Sutton's condition on the night of your daughter's death?

"*A.* She said he was drunk.

"*Q.* Did she say anything else about him?

"*A.* Well, she said that they had had an argument in the Contos' Rose Bowl, and not to blame Jo Ann. But he was drunk."

There was testimony of Brooks that Sutton was in an intoxicated condition; testimony of Jacqueline

Shepard, an employee of the defendants, that Sutton had at least one drink after returning to the Contos' Bar; her further testimony to a conversation, after the accident, with Aggie Hendrix, bartender at defendants' establishment the night and early morning prior to the accident, in which Mrs. Hendrix stated Sutton was drunk; and the admission against interest of Martha Watkins to the same effect in a conversation testified to by Mrs. Eisenzimmer.

From this testimony, which we view most favorably to the plaintiffs, a jury could conclude that Sutton was served drinks by the defendants while he was in an intoxicated condition, and that such condition impaired his judgment and his faculties so as to be causally related to the ensuing accident. The conflicting accounts of Sutton's intoxication during the night and early morning and of the intervals when liquor was served to him by defendants' employees prior to the accident presented issues of fact to be resolved by the jury. See *Shandor* v. *Lischer* (1957), 349 Mich 556; *Grinstead* v. *Anscer* (1958), 353 Mich 542; *Davis* v. *Terrien* (1961), 364 Mich 82; *Fletcher* v. *Flynn* (1962), 368 Mich 328; and *Schratt* v. *Fila* (1963), 371 Mich 238.

The decision of the Court of Appeals is reversed and the case is remanded to the trial court for a new trial. Costs to appellants.

DETHMERS, C. J., and KELLY, BLACK, T. M. KAVANAGH, SOURIS, O'HARA, and BRENNAN, JJ., concurred.